## Shiffer *v.* Hudson Coal Company, Appellant.

*Mines and mining—Coal lease—Construction—Royalties—Suspension of payment—Good faith—Case for jury.*

In an action of assumpsit to recover certain rents and royalties accruing under a coal lease, it appeared that the lease was to continue "until all the merchantable coal available by careful mining should be mined out," that during the continuance of the lease an annual rental of $4,800 was to be paid, for which the lessee was entitled to mine 1,250 tons of coal a month above the size of pea, and additional royalties were to be paid for pea coal mined, and for larger sizes mined in amounts in excess of the minimum. For three years beginning in 1894, the minimum rentals amounting to $13,000 were paid, but coal of the royalty value of only $4,600 was mined. Thereafter no further rentals were paid by the lessee which claimed that it had paid for all the merchantable coal available by careful mining. The mining operations were continued until 1905, when the deficit was wiped out, and were continued thereafter. It was provided in the lease that if the lessee's officers should be of opinion that it had paid for as much coal as still remained in the premises, tests should be made by engineers to be selected as provided in the lease, and if it should appear that rentals had been paid on all the coal, no further payments should be made until the coal upon which payments had been made was mined out, provided the coal was mined with due diligence. The plaintiff sought to recover the full amount of the minimum rentals for certain years when no payment had been made. It appeared that at the time of trial, 12,000 tons of merchantable coal were still unmined. Defendant contended that the suspension of payments had been made

as authorized by the lease. The evidence was conflicting and the trial judge left it to the jury to determine whether or not the original lessee "in good faith, with honest intention and intelligent knowledge......suspended payment of the minimum rental." The jury found a verdict for plaintiff upon which judgment was entered. *Held,* no error.

Argued April 13, 1914.    Appeal, No. 275, Jan. T., 1913, by defendant, from judgment of C. P. Luzerne Co.; Oct. T., 1908, No. 29, on verdict for plaintiffs in case of Frank E. Shiffer, Trustee of the Estate of Thomas Stem, deceased; Ralph D. Lacoe, Margaret L. White, Irvin S. White, her husband; Jessie Ford Smith, Edwin S. Smith, her husband, and Frank E. Shiffer, Surviving Executor of the Estate of J. B. Shiffer, deceased, v. The Hudson Coal Company. Before BROWN, MESTREZAT, POTTER, STEWART and MOSCHZISKER, JJ. Affirmed.

Assumpsit for rents and royalties alleged to be due under a coal lease.

The facts appear in the following opinion of FULLER, P. J., sur defendant's motion for a new trial.

This action of assumpsit was brought June 9th, 1908, by the legal representatives of the original lessors in a certain lease of coal, against the assignee of the original lessee, to recover certain coal rents and royalties which accrued after the assignment.

The lease was made in 1894 by Lacoe, Shiffer, Ford and Stem, to the Langcliffe Coal Company, Limited, of all the coal under certain land in Lackawanna County, "to have and to hold until all the merchantable coal available by careful mining should be mined out."

The lessee agreed to pay during the continuance of the lease the annual rental of $4,800, in monthly instalments of $400, for which payment it was entitled to mine each month 1,250 tons of coal above the size of pea. In addition to this minimum rental the lessee also agreed to pay at the same time for all coal above the size of pea actual-

ly mined in excess of 1,250 tons, at a royalty of thirty-two cents per ton; for all pea coal actually mined, at a royalty of twenty cents per ton, and for all buckwheat coal actually mined, at a royalty of ten cents per ton; the different sizes being determined by the mesh through which the coal was screened.

Between 1894 and 1897 the lessee paid minimum rental amounting to $13,600, and mined coal of all sizes amounting to $4,600, thus leaving a deficit of $9,000.

Then it ceased to make further payment, claiming that it had paid for all of the merchantable coal on the premises available by careful mining, although it continued its mining operations until 1901, when the deficit had been reduced to $7,000.

In 1901 it assigned the lease to the defendant, who went into possession and has been mining coal under the lease from that time until the present.

Lacoe died in 1899; Shiffer and Ford in 1901.

By 1905 the actual mining covered the deficit, and thereafter the defendant tendered payment for coal actually mined, aggregating, to January 1st, 1912, $8,-888.13, and during the year from June, 1907, to June, 1908, also tendered payment of the minimum rental, but all tenders were refused as the plaintiffs stood upon the contention that they were entitled to full payment of the minimum rental during the entire period.

In fact, from 1894, when the lease was made, until the time of the trial, in March, 1912, no payment was ever made for the smallest sizes of coal, but the mining thereof was credited upon the actual payment of minimum rental; and no payment was made of the minimum rental, except the sum of $13,600, paid by the original lessee between 1894 and 1897, nor was any tender of payment made, except by the defendant, as just stated, in 1905, down to 1908, when this action was instituted for the arrearages on both accounts, accruing since 1901.

During the entire period, possession and mining under

the lease have been continuous, and at the time of the trial upwards of 12,000 tons of merchantable coal still remained available, thus establishing the continuance of the lease and imposing liability for the amount of the verdict, unless such a result be obviated by the defense which has been set up.

The lease stipulates: "The second party (lessee) will pay or cause to be paid to the first parties (lessors) from the first day of October, A. D. 1894, the annual rental of $4,800 during the continuance of this lease, payable in monthly instalments of $400 each, the payment of which rentals shall entitle the second party (lessee) to mine and remove from the demised premises 1,250 tons of coal of larger sizes than pea coal in each month of each and every year during the continuance of this lease"; and then it allows the lessee to make up in any subsequent year the deficit between the payment of minimum rental and actual mining in any year, without interruption of minimum, by the provision, "that if in any one year such rentals be paid and the total quantity of such coal mined in that year shall be less than the total quantity which such payment of rentals should entitle the second party (lessee) to mine as aforesaid, the deficit may be mined and removed in any subsequent year during the continuance of this lease, without further payment, but this provision shall in no wise affect or interrupt the monthly payments of fixed rental as above agreed upon"; but nowhere does the contract disclose any intention to absolve the lessee from payment of the minimum rental, except in the twelfth covenant, viz: "If at any time or times, the second party shall in the opinion of its proper officers, have paid for as much coal which they have not mined as still remains in the premises unmined and capable of being worked under this agreement, they shall give notice thereof to the first parties, and thereupon each party shall choose a competent and disinterested mining engineer, who shall select a third competent and disinterested mining engineer, and the three so chosen

shall make all necessary examination of the premises and receive such other proper evidence and tests as shall be sufficient to determine the amount of coal unmined therein, taking into account such coal as is required to be mined under the provisions of this agreement; and the second party agrees, at its own expense, to furnish such evidence and make such actual tests as will be sufficient for that purpose. And if on such examination, proof and tests, it shall be shown and proved by the second party that it has paid rentals as aforesaid upon all the coal in said premises mineable as aforesaid, the second party shall thereupon not be required to make any further payments of rent or royalties until it shall have mined out the quantity upon which rentals have been so paid, and thereafter it shall only be liable to pay rentals or royalties upon coal mined in excess of the amount on which rentals or royalties have been so paid, using due diligence to complete the mining of the same. Provided, however, that whenever the party of the second part, by virtue of this clause and the proceedings above indicated, shall have ceased paying the fixed monthly rentals aforesaid for a period of ten years, the parties of the first part may at their option terminate this lease and proceed to recover possession of the demised premises as in case of forfeiture for nonpayment of rentals when due."

The defendant undertook to bring itself within the benefit of this twelfth covenant, not through the medium of disinterested mining engineers at all, but through the opinion of the original lessee formed in 1897 and communicated to the original lessors then living, since deceased, who so far as the evidence shows made no objection.

It will be observed that the covenant does not expressly constitute the engineers a board of arbitration, nor provide for an award, and we held the opinion upon the trial that the right to suspend was only dependent upon the formation by lessee of an honest, intelligent opinion,

communicated to the lessors and fortified by examination.

Accordingly we charged the jury thus:

"The lessees' right to claim the benefit of this covenant number twelve and suspend the minimum payments of rental, is conditioned and depends upon these things, first the proper officers of the lessee should have come to the honest and intelligent opinion that all the coal in the ground had been paid for; second, they should then have given notice to that effect to the lessors and selected a competent and disinterested mining engineer for the investigation; then if the lessors did their part as agreed and made a like selection, all the machinery would be set in motion to decide the matter properly, but if the lessors failed to do their part and make a selection so that no further steps along that line could be taken as agreed, the lessees should still make such investigation, if not already made, as would reasonably justify the formation of an opinion in respect to the quantity of coal left unmined. It is very plain, I think, that the lessee could not of its own sweet will arbitrarily decide to suspend payment on pretext of an opinion, unsupported by reasonable investigation or knowledge of the conditions. It should be an honest and intelligent opinion, formed in good faith, on adequate knowledge." Then, after an exhaustive review of the testimony, we submitted the case with this final instruction. "If you find as a fact that the original lessee in good faith, with honest intention and intelligent knowledge, after notice to the lessors in conformity with covenant number twelve, suspended payment of the minimum rental, the verdict in this case should be in favor of the plaintiffs for only $9,469.55; if you fail to find such a fact (and the burden to establish the fact is upon the defendant), your verdict in that event should be in favor of the plaintiffs for the full amount, $48,180."

These figures were concededly correct, according to the alternative adopted.

The evidence on the subject is fully recited in our charge, to which we refer.

It consisted chiefly of contemporaneous testimony given by the engineer and the treasurer, who were also stockholders, of the original lessee, and who only acquired competency to testify against the representatives of the deceased lessors by parting with their stock. Fortified though it was, we could not have withdrawn from the jury the credibility of these witnesses, particularly in light of the fact, established by later development of the property, that they were in error to the extent of 50,000 tons, more than twice the quantity mined at the time of suspension.

The failure of the lessors, Shiffer, Lacoe and Ford, old men, to combat the claim of deficiency during the few remaining years of their lives, was not a fact of controlling significance, and while a jury would have been fully warranted in taking defendant's view of the question, we are unable to say that they were not warranted in taking the opposite view.

Furthermore, conceding that the suspension of minimum payments in 1897 was proper under the circumstances, the period of suspension, nevertheless, was limited, in the language of the twelfth covenant by the "use of due diligence to complete the mining."

This phase of the matter seems to have been overlooked at the trial, but clearly it should be considered.

The fact of deficiency could not be conclusively determined by the judgment of the lessee, even though honest, intelligent and fortified by the finding of engineers in the manner stipulated, for such a conclusion might be refuted, as it was refuted, by actual development of the property.

The privilege of suspension is coupled with the obligation to catch up and finish as fast as possible in the exercise of due diligence, and not to stop or to loiter at pleasure.

In this case, in the absence of the countervailing proof,

which it was incumbent upon the defendant to produce, due diligence is prima facie determined by the minimum annual payment of $4,800, for 15,000 tons above the size of pea, at 32 cents per ton, which tonnage, added to the incidental production of smaller sizes, as shown by the mining under this lease, amounts to nearly 20,000 tons per year. The minimum, in other words, expressed the understanding of the parties as to what would constitute a fair year's mining.

During the period from 1894 to 1897, however, the mining only averaged 8,000 tons, from 1897 to 1901 only 2,000 tons, from 1901 to 1905 only 9,000 tons, from 1905 to 1908 only 3,000 tons, from 1908 to 1912 only 5,000 tons, and over the entire period of the lease, from 1894 to the time of trial in 1912, eighteen years, a maximum mining is shown of only 90,000 tons, a general average of 5,000 tons, without disclosure of adequate cause for such an extraordinary deficit below the minimum.

This surely demonstrates a lack of due diligence after 1897 to complete the mining, and regardless of the attitude manifested towards the original lessee by the original lessors prior to their deaths, fully justified their representatives in terminating the suspension, by notice, in 1902, to this defendant, would perhaps have justified binding instructions in favor of the plaintiffs, and furnishes persuasive reason against disturbing the verdict.

The defense in this case, as urged upon the trial and expressed in the reasons for a new trial, is principally predicated upon the contentions, (1) that the weight of credible evidence established the affirmative of the question submitted to the jury, on which their verdict by instruction of the court was made to hinge, viz: the bona fides of lessee's opinion in 1897, (2) that the attitude of the original lessors demonstrated their acquiescence in said opinion and now estops their representatives on the theory of defendant's reliance thereon in taking and working the property, (3) that a reasonable interpretation of the lease limits total payment to the royalty

value of the original mineable coal, which value is far less than the amount of the verdict, $48,180, added to the prior payment of $13,600, an inequitable result.

The first contention is overruled because the preponderance was not so plain as to exclude the province of the jury, and also because the right of suspension was subject to the exercise of due diligence.

The second contention is overruled because we fail to find any room for the operation of estoppel in favor of the defendant against the plaintiffs.

No claim is made for the minimums which accrued from 1897 to 1901, anterior to defendant's acquisition of the lease.

No proof was given or offered to show reliance by the defendant upon the conduct of the original lessors in failing to make objection, although an offer was made to show defendant's knowledge of such conduct.

The representatives of the lessors did give notice of objection, which, coupled with the broken condition to exercise due diligence, revived the original obligation to pay minimum, if, indeed, the obligation was ever really interrupted.

The third contention could not be sustained without making a new contract for the parties and doing violence to the decisions which hold that the contract governs, regardless of deficiency between amount paid and quantity mineable.

It is a plain case of stare decisis (Lehigh & Wilkes-Barre Coal Co. v. Wright, 177 Pa. 387; Lehigh Valley Coal Co. v. Everhart, 206 Pa. 118).

The purpose of a minimum is to expedite removal of the coal and return of the property when removal is complete.

It is not inequitable for lessors to claim literal enforcement of a stipulation which entails no injury upon a lessee using due diligence as defined in the contract.

By the contract in this case, the lessee agreed to pay certain minimum rentals and royalties "during the con-

tinuance of the lease"; the lease continues "until all the merchantable coal available by careful mining shall be mined out"; upwards of 12,000 tons of such coal have not yet been mined out; therefore the obligation to pay still continues unless obviated by covenant twelve; and for reasons already stated that covenant cannot obviate under the circumstances.

The main distinction sought to be drawn between this lease and those construed in the cases above cited, viz: the presence here of a provision absent there, known as a "stop clause," enabling lessee on certain conditions to obtain relief, does not lead to any different result if the contractual conditions are not fulfilled, and so this case, like the others in the last analysis, must stand upon the contract.

The suggestion of hardship in being compelled to pay for more coal than can be mined, has been urged and ignored in all the cases, and in the present case the net hardship simply consists in paying, exclusive of interest, about $50,000 for about 100,000 tons of coal, making an average royalty of about fifty cents per ton, which is not inordinate in light of reputed profits derived from the business.

. Upon a dispassionate view of the whole case, while it presents difficulties and perhaps involves material errors, we have concluded that the verdict should not be disturbed, and accordingly the motion for a new trial is denied.

Verdict for plaintiff for $48,180 and judgment thereon. Defendant appealed.

*Errors assigned* were instructions to the jury, answers to points and rulings on evidence.

*James H. Torrey,* with him *John T. Lenahan, Andrew H. McClintock* and *Walter C. Noyes,* for appellant.

*F. W. Wheaton,* with him *P. F. O'Neill,* for appellee.

PER CURIAM, May 22, 1914:

The facts in this case appear in the opinion of the court denying the motion for a new trial, and, for the reasons therein stated, the case was for the jury. We discover nothing in the assignments of error calling for its submission to another jury, and the judgment is, therefore, affirmed.